# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MISSOURI
## EASTERN DIVISION

PHILLIP W. CARPENTER,     )
            )
   Plaintiff,      )
            )
   vs.        )     **Case No. 4:05 CV1284 CAS (LMB)**
            )
JO ANNE B. BARNHART,    )
Commissioner of Social Security,   )
            )
   Defendant.     )

## REPORT AND RECOMMENDATION
## OF UNITED STATES MAGISTRATE JUDGE

This is an action under 42 U.S.C. § 405(g) for judicial review of defendant's final decision

denying the application of Phillip W. Carpenter for Disability Insurance Benefits under Title II of

the Social Security Act and Supplemental Security Income benefits under Title XVI of the Act.

The cause was referred to the undersigned United States Magistrate Judge for a Report and

Recommendation pursuant to 28 U.S.C. § 636 (b). Plaintiff has filed a Brief in Support of

Complaint. (Document Number 12). Defendant has filed a Brief in Support of the Answer.

(Doc. No. 13).

## Procedural History

On April 28, 2003, plaintiff filed his applications for Disability Insurance Benefits and

Supplemental Security Income, claiming that he became unable to work due to his disabling

condition on July 1, 2002. (Tr. 40-42, 167-69). Plaintiff's applications were denied initially, and

following an administrative hearing, plaintiff's claims were denied in a written opinion by an

Administrative Law Judge (ALJ), dated April 2, 2005.  (Tr. 31-36, 10-17).  Plaintiff then filed a

request for review of the ALJ's decision with the Appeals Council of the Social Security

Administration (SSA), which was denied on June 20, 2005.  (Tr. 6, 3-5).  Thus, the decision of

the ALJ stands as the final decision of the Commissioner.  <u>See</u> 20 C.F.R. §§ 404.981, 416.1481

(2003).

## Evidence Before the ALJ

### A.    ALJ Hearing

Plaintiff's administrative hearing was held on November 22, 2004.  (Tr. 177).  Plaintiff

was present and was represented by counsel.  (<u>Id.</u>).  The ALJ began by admitting a number of

exhibits into evidence.  (Tr. 178-79).  The ALJ granted plaintiff 30 days to provide additional

medical records from plaintiff's treating psychiatrist.  (<u>Id.</u>).

Plaintiff's attorney then examined plaintiff, who testified that he was 39 years of age,

finished the eighth grade, and obtained a GED.  (Tr. 178).  Plaintiff stated that he also received

some computer training.  (Tr. 179).  Plaintiff testified that he cannot concentrate long enough to

read a newspaper.  (<u>Id.</u>).  Plaintiff stated that he could probably write a letter, although he had not

done so in years.  (<u>Id.</u>).  Plaintiff testified that he can add and subtract, multiply and divide, and

make change.  (<u>Id.</u>).  Plaintiff stated that he hardly drives because he is too nervous and

experiences difficulty concentrating.  (<u>Id.</u>).  Plaintiff testified that he is five-feet, eight-inches tall

and weighs 173 pounds.  (<u>Id.</u>).

Plaintiff testified that joint pain and neck stiffness are his biggest physical problems.  (Tr.

180).  Plaintiff stated that he has been diagnosed with fibromyalgia.[1]  (<u>Id.</u>).  Plaintiff testified that

---

[1]A syndrome of chronic pain of musculoskeletal origin but uncertain cause.  The American
College of Rheumatology has established diagnostic criteria that include pain on both sides of the

his neck becomes stiff and he has difficulty moving his head. (Id.). Plaintiff explained that this stiffness occasionally lasts up to a week and causes him to remain in bed all day. (Id.). Plaintiff testified that he is taking Celebrex,[2] although it has not provided any noticeable relief. (Id.). Plaintiff stated that the Celebrex has not caused any side effects, other than making him sleep a lot. (Id.). Plaintiff testified that the fibromyalgia causes him to experience pain everywhere, including his joints, knees, ankles, feet, hips, and back. (Id.).

Plaintiff testified that he has been diagnosed with Raynaud's phenomenon.[3] (Tr. 181). Plaintiff stated that this condition causes his hands and feet to become cold and numb. (Id.). Plaintiff testified that he experiences difficulty gripping and handling objects most of the time. (Id.). Plaintiff stated that he experiences headaches every day. (Id.). Plaintiff stated that he has severe headaches once a week that cause him to lie down in a dark, quiet room. (Id.).

Plaintiff testified that he experiences difficulty concentrating and remembering. (Tr. 182). Plaintiff stated that he occasionally forgets to take his medication. (Id.). Plaintiff testified that he also has problems reading. (Id.).

Plaintiff stated that he has a cyst on his left wrist that is painful. (Id.). Plaintiff testified that a doctor has not recommended surgically removing the cyst. (Id.).

Plaintiff testified that his mental impairments probably impact his physical impairments.

---

body both above and below the waist, as well as in an axial distribution; additionally there must be point tenderness in at least 11 of 18 specified sites. Stedman's Medical Dictionary, 671 (27th Ed. 2000).

[2]Celebrex is indicated for relief of the signs and symptoms of arthritis, and for the management of acute pain. See Physician's Desk Reference (PDR), 3097 (59th Ed. 2005).

[3]Spasm of the digital arteries, with blanching and numbness or pain of the fingers, often precipitated by cold. Stedman's at 1365.

(Tr. 183).  Plaintiff stated that he is seeing a psychiatrist, Dr. Russell Leaswell.  (Id.).  Plaintiff

testified that he sees Dr. Leaswell once a week, and that he has probably seen him about ten

times.  (Id.).  Plaintiff stated that he is discussing his childhood with Dr. Leaswell.  (Id.).  Plaintiff

testified that he was sexually abused when he was a child.  (Id.).  Plaintiff stated that he did not

remember the abuse until recently, and that Dr. Leaswell is trying to help him remember these

events.  (Tr. 183-84).  Plaintiff testified that he is depressed.  (Tr. 184).  Plaintiff stated that he

sits around and stares out the window all day.  (Id.).  Plaintiff testified that Dr. Leaswell is trying

to help him by discussing his childhood.  (Id.).

Plaintiff testified that he has worked at various positions, including delivering pizzas,

driving a taxi, and working with computers.  (Id.).  Plaintiff stated that he cannot work at any of

these positions now because his legs give out and the positions require walking.  (Id.).  Plaintiff

testified that he experiences restless leg syndrome[4] at night.  (Tr. 185).  Plaintiff stated that this

condition causes him to have nightmares and difficulty sleeping.  (Id.).  Plaintiff testified that he

has also been diagnosed with post traumatic stress syndrome.[5]  (Id.).

Plaintiff testified that he has trouble dealing with everyday pressures.  (Id.).  Plaintiff

stated that his wife pays the household bills.  (Id.).  Plaintiff testified that he does not answer the

telephone, and allows the answering machine to pick up calls.  (Id.).  Plaintiff testified that he

---

[4]A sense of indescribable uneasiness, twitching or restlessness that occurs in the legs after going to bed, frequently leading to insomnia which may be relieved temporarily by walking about; thought to be caused by inadequate circulation or as a side effect of antipsychotic medication. Stedman's at 1765.

[5]A disorder appearing after a physically or psychologically traumatic event outside the range of usual human experience, characterized by symptoms of re-experiencing the event, numbing of responsiveness to the environment, exaggerated startle response, guilt feeling, impairment of memory, and difficulties in concentration and sleep.  Stedman's at 1764.

does not like to talk to people. (Id.). Plaintiff stated that he had trouble being around people when he worked as a taxi driver. (Id.). Plaintiff testified that he worked at that position for a year, but missed a lot of work because he did not go on calls. (Tr. 185-86). Plaintiff stated that he had trouble delivering pizzas because his legs hurt when he got in and out of the car. (Tr. 186). Plaintiff testified that he also had problems dealing with people at that job. (Id.). Plaintiff stated that he worked for the State entering orders in a computer and loading paper on machines. (Id.). Plaintiff testified that he could not perform that job now because the job required him to be around people. (Tr. 187).

Plaintiff testified that he experiences pain when he sits for long periods, due to the fibromyalgia. (Id.). Plaintiff stated that he was in pain from sitting down during the hearing. (Id.). Plaintiff testified that his feet begin to hurt when he stands for long periods, and that he has fallen when his feet gave out. (Id.).

The ALJ next examined plaintiff, who testified that his wife's job at Wal-Mart is the source of the household income. (Id.). Plaintiff stated that he does not receive Medicaid benefits. (Id.). Plaintiff testified that he receives a reduced rate for medical services through a program for the uninsured. (Tr. 187-88).

Plaintiff's attorney then examined plaintiff, who testified that he was shaking at the hearing because he has difficulty with stressful situations. (Tr. 188).

Plaintiff's attorney then examined plaintiff's wife, Lori Carpenter, who testified that she had been married to plaintiff for one year. (Id.). Mrs. Carpenter stated that plaintiff was married before and his wife left him. (Id.). Mrs. Carpenter testified that plaintiff sleeps the majority of the day due to his physical and mental problems. (Tr. 189). Mrs. Carpenter stated that plaintiff is in

significant pain, and that he does not even accompany her to the grocery store any more due to his physical and mental impairments. (Id.). Mrs. Carpenter testified that plaintiff has nightmares and wakes her up during the night because he tosses and turns. (Id.). Mrs. Carpenter indicated that plaintiff suffers from restless leg syndrome. (Id.). Mrs. Carpenter testified that she has observed plaintiff dropping objects such as coffee mugs, due to his problems gripping. (Tr. 190). Mrs. Carpenter stated that she handles the bills because plaintiff is unable to do so. (Id.).

Mrs. Carpenter testified that plaintiff was shaking at the hearing because this occurs whenever he is confronted with a stressful situation. (Id.). Mrs. Carpenter expressed the opinion that plaintiff would react in this way if he tried to work. (Id.). Mrs. Carpenter stated that because plaintiff shakes when he is around people, they usually stay at home. (Id.). Mrs. Carpenter testified that the only place plaintiff goes is to church on Sundays. (Tr. 191). Mrs. Carpenter stated that plaintiff has trouble being around people at church, and that they do not talk to people after the service. (Id.).

Plaintiff's attorney then examined plaintiff's mother, Nadine Van Sant, who testified that she divorced plaintiff's father when plaintiff was four years old. (Tr. 192). Ms. Van Sant testified that plaintiff has four sisters and one brother. (Id.). Ms. Van Sant stated that she discovered that plaintiff was being sexually abused by his father when plaintiff was sixteen years old, although she did not discover all the facts until her daughter told her two years prior to the hearing. (Tr. 192-93). Ms. Van Sant testified that her daughter has been receiving extensive therapy due to the abuse. (Tr. 193). Ms. Van Sant explained that plaintiff's father sexually abused plaintiff and his sister at the same time. (Id.). Ms. Van Sant testified that until recently plaintiff had no memory of his childhood. (Id.).

Ms. Van Sant stated that since plaintiff has been seeing Dr. Leaswell, he has begun to remember some events from his childhood. (Tr. 193-94). Ms. Van Sant testified that Dr. Leaswell is trying to help plaintiff remember the sexual abuse. (Tr. 194). Ms. Van Sant expressed the opinion that the sexual abuse is the source of most of plaintiff's problems, and that it is increasing his physical pain. (Id.).

Ms. Van Sant testified that plaintiff has also sustained physical injuries several times during his life. (Id.). Ms. Van Sant stated that plaintiff's father hit him in the head several times and knocked him out. (Id.). Ms. Van Sant testified that plaintiff injured his face in an automobile accident that occurred when he was four years old. (Id.). In addition, Ms. Van Sant stated that plaintiff was injured in a sledding accident as a child, and he was hit by a car when he was seven or eight years old. (Id.). Ms. Van Sant stated that plaintiff did not tell his father he was hit by a car because he was afraid his father would harm him. (Id.).

Ms. Van Sant testified that plaintiff has experienced difficulty dealing with issues since childhood and that he has been treated by a psychiatrist. (Tr. 195). Ms. Van Sant stated that her 45-year-old daughter just recently remembered the abuse and is currently suicidal. (Id.).

The ALJ then closed the hearing. (Id.). He indicated that he would leave the record open. (Id.).

**B.    Relevant Medical Records**

The record reveals the plaintiff presented to J.S. Villa, M.D. on May 9, 2001, with a variety of complaints, including occasional tenderness in his right knee, a small cyst on his left wrist, a hangnail on his right thumb, a small lump behind his left ear, a dry patch on the back of his right hand, jaw ache, headache, difficulty sleeping, poor concentration, cold hands and feet,

occasional chest wall pain, and mild impotence.  (Tr. 113).  Dr. Villa noted that plaintiff was not

taking any medications at that time.  (Id.).  Upon physical examination, Dr. Villa found no spinal

tenderness and no evidence of weakness or grip strength problems.  (Tr. 114).  Dr. Villa's

assessment was: elevated blood sugar on screening, Raynaud's phenomenon, likely depression,

hangnail, hemorrhoids, impotence, headaches, neck pain, jaw pain, sebaceous[6] cyst, benign skin

lesions, tobacco abuse, chest pain, and constipation.  (Id.).  Dr. Villa started plaintiff on Celebrex

for his headaches, treated plaintiff's hangnail and dry skin patches, referred plaintiff to the erectile

dysfunction clinic, recommended evaluating plaintiff's blood sugar levels and depression, and

stated that the remainder of plaintiff's symptoms do not require evaluation.  (Id.).

Plaintiff saw Dr. Villa for a follow-up regarding his various complaints on May 11, 2001.

(Tr. 115).  Dr. Villa noted that testing revealed that plaintiff's cholesterol levels were normal.

(Id.).  Dr. Villa gave plaintiff samples of Norvasc,[7] continued him on Celebrex, and discussed

improving his diet.  (Id.).  Dr. Villa noted that plaintiff's hand looked good.  (Id.).

Plaintiff presented to Dr. Villa on May 24, 2001, for a follow-up regarding his erectile

dysfunction clinic visit.  (Tr. 116).  Plaintiff reported that his neck pain had improved since

starting the Celebrex.  (Id.).  Dr. Villa's assessment was neck pain, Raynaud phenomenon,

depression, occasional chest pains, headaches, constipation, erectile dysfunction, and tobacco

abuse.  (Id.).  Dr. Villa continued plaintiff on Norvasc and Celebrex, and started him on Viagra.[8]

(Id.).  Dr. Villa indicated that plaintiff's tobacco use, which was his most significant other medical

---

[6]Oily; fatty.  See Stedman's at 1609.

[7]Norvasc is indicated for the treatment of hypertension.  See PDR at 2621.

[8]Viagra is indicated for the treatment of erectile dysfunction.  See PDR at 2656.

problem, would be addressed in subsequent visits. (Id.).

On September 21, 2001, plaintiff complained of medial leg pain. (Tr. 118). Dr. Villa gave plaintiff samples of Vioxx,[9] and recommended stretching and ice. (Id.).

Plaintiff's wife called Dr. Villa's office on March 28, 2002, and indicated that plaintiff was experiencing nasal congestion and sinus problems. (Id.). Dr. Villa recommended over-the-counter medications. (Id.).

Plaintiff saw psychologist Kenneth G. Mayfield on May 5, 2003, for a psychological consultation. (Tr. 134-36). Mr. Mayfield stated that plaintiff reported "rather vague" somatic complaints, including knee injury, foot and ankle swelling, and neck stiffness. (Tr. 134). Mr. Mayfield found plaintiff to be a "fairly reliable" informant. (Id.). Mr. Mayfield noted that plaintiff alluded to a history of depression, although there was no report of psychiatric treatment, hospitalization, or counseling. (Tr. 135). Mr. Mayfield stated that plaintiff described a largely sedentary lifestyle due to alleged foot pain. (Id.). Mr. Mayfield described plaintiff's mood as anxious and depressed. (Id.). Mr. Mayfield's diagnosis was rule out personality disorder.[10] (Id.).

---

[9]Vioxx is indicated for the relief of the signs and symptoms of arthritis and for the management of acute pain. See PDR at 2174.

[10]General term for a group of behavioral disorders characterized by usually lifelong ingrained maladaptive patterns of subjective internal experience and deviant behavior, lifestyle, and social adjustment, which patterns may manifest in impaired judgment, affect, impulse control, and interpersonal functioning. Stedman's at 527.

Mr. Mayfiled assessed a GAF[11] of 60.[12]  Mr. Mayfield stated that plaintiff's ability to relate to others was borderline intact and there were indications of considerable social isolation and constriction of interests and habits.  (Id.).  Mr. Mayfield stated that plaintiff was able to care for his basic personal needs and financial affairs, and was able to understand and follow verbal directions.  (Id.).  Mr. Mayfield found that plaintiff's ability to cope with stress and the pressures of routine activities "appeared somewhat questionable."  (Id.).  Mr. Mayfiled expressed the opinion that plaintiff was in need of "counseling and direction."  (Id.).

On May 8, 2003, plaintiff was examined by Dr. Fernando DeCastro and declared disabled for the purpose of qualifying for public assistance in the State of Missouri.  (Tr. 128-29).  Dr. DeCastro diagnosed plaintiff with possible fibromyalgia and borderline personality disorder.[13]  (Tr. 129).  Dr. DeCastro expressed the opinion that plaintiff's disability would last three months.  (Tr. 129).

On June 30, 2003, plaintiff saw Richard M. Secor, D.O., for an examination in connection with his disability claim.  (Tr. 137-144).  Dr. Secor stated that plaintiff presented "an exhausting

---

[11]The Global Assessment of Functioning Scale (GAF) is a psychological assessment tool wherein an examiner is to "[c]onsider psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness" which does "not include impairment in functioning due to physical (or environmental) limitations." Diagnostic and Statistical Manual of Mental Disorders (DSM-IV), 32 (4th Ed. 1994).

[12]A GAF score of 51-60 denotes "[m]oderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers)." DSM-IV at 32.

[13]An enduring and pervasive pattern that begins by early adulthood and is characterized by impulsivity and unpredictability, unstable interpersonal relationships, inappropriate or uncontrolled affect, especially anger, identity disturbances, rapid shifts of mood, suicidal acts, self-mutilations, job and marital instability, chronic feeling of emptiness or boredom, and intolerance of being alone. Stedman's at 526.

list of 37 different signs and symptoms, which basically include every organ system in the body."

(Tr. 137). Dr. Secor noted that there is no history of any neck injury, injury to the extremities, or

diagnosis of circulation problems. (Id.). Dr. Secor stated that plaintiff indicated that he was told

he might have fibromyalgia, although the author of this statement was unknown. (Id.). Upon

physical examination, Dr. Secor found plaintiff's gait to be unremarkable. (Tr. 139). Dr. Secor

noted that plaintiff was able to sit, stand, and lie down without assistance; stand on his toes and

heels independently; and had negative straight leg raising, full grip strength, no muscle atrophy,

and no joint swelling or tenderness. (Id.). Dr. Secor's impression was: multiple somatic

complaints with morning stiffness related and off and on swelling, not medically evaluated or

treated; apparent erectile dysfunction by history; probable depression; and most likely

degenerative joint disease.[14] (Id.). Dr. Secor recommended that plaintiff exercise, follow-up with

his family physician, and obtain arch supports. (Tr. 140).

　　The record reveals that plaintiff presented to the emergency room on August 22, 2004.

(Tr. 146-47). Discharge instructions indicate that plaintiff was diagnosed with epididymitis,[15]

arthritis,[16] and depression. (Id.).

　　Plaintiff presented to J.D. Auner, M.D. on September 14, 2004, for an evaluation of his 37

different complaints. (Tr. 150). Dr. Auner noted that plaintiff was "relatively well muscled"

without atrophy, and that plaintiff was walking "like a sick, old person." (Id.). Dr. Auner's

---

[14]Disease characterized by deterioration of the lumbar vertebrae. See Stedman's at 467.

[15]Inflammation of the testes. See Stedman's at 604.

[16]Inflammation of a joint. Stedman's at 148.

impression was depression.  (Id.).  Dr. Auner gave plaintiff a starter pack of Zoloft[17] and recommended obtaining x-rays.  (Id.).

Plaintiff saw Dr. Auner for a follow-up of his various complaints on September 28, 2004. (Tr. 151).  Dr. Auner listed plaintiff's symptoms as "apparent fibromyalgias," Raynaud's, a history of asthma as a child, a history of migraines, chest pain, irritable bowel with alternating constipation and diarrhea, and possible bladder spasms.  (Id.).  Dr. Auner's impression was multiple smooth muscle hyperreactivity, depression secondary.  (Id.).  Dr. Auner recommended that plaintiff try Zoloft for a week, and try Avapro[18] to prevent his migraines.  (Id.).  Dr. Auner also scheduled x-rays of plaintiff's hands and knees.  (Id.).

Plaintiff underwent bilateral hand and knee x-rays on September 28, 2004, which were unremarkable.  (Tr. 156).  No fracture, dislocation, or significant degenerative changes were present in plaintiff's hands or knees.  (Id.).  Plaintiff's knee joints appeared well maintained bilaterally.  (Id.).

Plaintiff saw Dr. Auner for a follow-up on October 12, 2004.  (Tr. 152).  Dr. Auner stated that x-rays were negative for arthritis in the peripheral joints.  (Id.).  Dr. Auner indicated that x-rays of the spine were not obtained because plaintiff could not afford the x-rays.  (Id.).  Dr. Auner stated that plaintiff reported no improvement from the Zoloft, although he did not want to start plaintiff on addictive pain killers for his condition, which is most likely fibromyalgia.  (Id.).  Dr.

---

[17]Zoloft is indicated for the treatment of major depressive disorder, obsessive-compulsive disorder, panic disorder, posttraumatic stress disorder, and social anxiety disorder.  See PDR at 2682-83.

[18]Avapro is indicated for the treatment of hypertension.  See PDR at 1034-35.

Auner recommended that plaintiff start taking Neurontin[19] if he can obtain Medicaid benefits. (Id.). In a separate note dated October 12, 2004, Dr. Auner listed plaintiff's diagnoses as fibromyalgia, migraine, and depression. (Tr. 153). Dr. Auner expressed the opinion that plaintiff was incapacitated at that time and probably would remain so for more than twelve months. (Id.).

The record reveals that plaintiff saw a therapist eight times from September 2, 2004, to October 28, 2004. (Tr. 158-65). On plaintiff's initial visit, plaintiff was diagnosed with dysthymia,[20] with a note to rule out hypochondria,[21] and was assessed a GAF of 60. (Tr. 158-59). Plaintiff was not found to be suicidal. (Id.).

### The ALJ's Determination

The ALJ made the following findings:

1.  The claimant met the special earnings requirements of the Act as of July 1, 2002, the alleged onset of disability, and continues to meet them through the date of this decision.

2.  The claimant probably has not engaged in substantial gainful activity since July 1, 2002, although he had several jobs for pay until December 30, 2002.

3.  The medical evidence establishes that the claimant has possible mild fibromyalgia, infrequent headaches, a small left wrist cyst, and a history of mild depression, but no impairment or combination of impairments that meets or equals in severity the requirements of any impairment listed in Appendix 1 Subpart P, Regulations No. 4.

---

[19]Neurontin is indicated for the management of postherpetic neuralgia. See PDR at 2590.

[20]A chronic mood disorder manifested as depression for most of the day, more days than not, accompanied by some of the following symptoms: poor appetite or overeating, insomnia or hypersomnia, low energy or fatigue, low self-esteem, poor concentration, difficulty making decisions, and feelings of hopelessness. Stedman's at 556.

[21]A morbid concern about one's own health and exaggerated attention to any unusual bodily or mental sensations; a delusion that one is suffering from some disease for which no physical basis is evident. Stedman's at 859.

4.     The claimant's allegation and those of six other witnesses of impairments, either singly or in combination, producing symptoms and limitations of sufficient severity to prevent the performance of any sustained work activity are not credible, for the reasons set out in the body of this decision.

5.     The claimant has the residual functional capacity to perform the physical exertional and nonexertional requirements of work except possibly for frequent lifting or carrying of more than about 50 pounds. There are no credible, medically-established mental or other nonexertional limitations (20 CFR 404.1545 and 416.945).

6.     The claimant's past relevant work as a store manager did not require the performance of work-related activities precluded by the limitations described in Finding No. 5 (20 CFR 404.1565 and 416.965). The impairments established in this case do not prevent the claimant from performing this past relevant work.

7.     The claimant was not under a "disability," as defined in the Social Security Act, at any time through the date of this decision (20 CFR 404.1520(f) and 416.920(f)).

(Tr. 16-17).

The ALJ's final decision reads as follows:

It is the decision of the Administrative Law Judge that, based upon the applications filed on April 28, 2003, the claimant is not entitled to a period of disability or to disability insurance benefits under Sections 216(i) and 223, respectively, of the Social Security Act; and is not eligible for supplemental security income under Sections 1602 and 1614(a)(3)(A) of the Act.

(Tr. 17).

## Discussion

### A.     Standard of Review

Judicial review of a decision to deny Social Security benefits is limited and deferential to

the agency. See Ostronski v. Chater, 94 F.3d 413, 416 (8th Cir. 1996). The decision of the SSA

will be affirmed if substantial evidence in the record as a whole supports it. See Roberts v. Apfel,

222 F.3d 466, 468 (8th Cir. 2000). Substantial evidence is less than a preponderance, but enough

that a reasonable mind might accept it as adequate to support a conclusion. See Kelley v. Callahan, 133 F.3d 583, 587 (8th Cir. 1998). If, after review, it is possible to draw two inconsistent positions from the evidence and one of those positions represents the Commissioner's findings, the denial of benefits must be upheld. See Robinson v. Sullivan, 956 F.2d 836, 838 (8th Cir. 1992). The reviewing court, however, must consider both evidence that supports and evidence that detracts from the Commissioner's decision. See Johnson v. Chater, 87 F.3d 1015, 1017 (8th Cir. 1996) (citing Woolf v. Shalala, 3 F.3d 1210, 1213 (8th Cir. 1993)). "[T]he court must also take into consideration the weight of the evidence in the record and apply a balancing test to evidence which is contrary." Burress v. Apfel, 141 F.3d 875, 878 (8th Cir. 1998). The analysis required has been described as a "searching inquiry." Id.

**B.    The Determination of Disability**

The Social Security Act defines disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 416 (I) (1) (a); 42 U.S.C. § 423 (d) (1) (a). The claimant has the burden of proving that s/he has a disabling impairment. See Ingram v. Chater, 107 F.3d 598, 601 (8th Cir. 1997).

The SSA Commissioner has established a five-step process for determining whether a person is disabled. See 20 C.F.R. §§ 404.1520, 416.920; Bowen v. Yuckert, 482 U.S. 137, 141-42, 107 S. Ct. 2287, 2291, 96 L. Ed. 2d. 119 (1987); Fines v. Apfel, 149 F.3d 893, 894-895 (8th Cir. 1998). First, it is determined whether the claimant is currently engaged in "substantial gainful employment." If the claimant is, disability benefits must be denied.

See 20 C.F.R. §§ 404.1520, 416.920 (b).  Step two requires a determination of whether the claimant suffers from a medically severe impairment or combination of impairments.

See 20 C.F.R §§ 404.1520 (c), 416.920 (c).  To qualify as severe, the impairment must significantly limit the claimant's mental or physical ability to do "basic work activities."  Id.  Age, education and work experience of a claimant are not considered in making the "severity" determination.  See id.

If the impairment is severe, the next issue is whether the impairment is equivalent to one of the listed impairments that the Commissioner accepts as sufficiently severe to preclude substantial gainful employment.  See 20 C.F.R. §§ 404.1520 (d), 416.920 (d).  This listing is found in Appendix One to 20 C.F.R. 404.  20 C.F.R. pt. 404, subpt. P, App. 1.  If the impairment meets or equals one of the listed impairments, the claimant is conclusively presumed to be impaired.  See 20 C.F.R. §§ 404.1520 (d), 416.920 (d).  If it does not, however, the evaluation proceeds to the next step which inquires into whether the impairment prevents the claimant from performing his or her past work.  See 20 C.F.R. § 404.1520 (e), 416.920 (e).  If the claimant is able to perform the previous work, in consideration of the claimant's residual functional capacity (RFC) and the physical and mental demands of the past work, the claimant is not disabled.

See id.  If the claimant cannot perform his or her previous work, the final step involves a determination of whether the claimant is able to perform other work in the national economy taking into consideration the claimant's residual functional capacity, age, education and work experience.  See 20 C.F.R. §§ 404.1520 (f), 416.920 (f).  The claimant is entitled to disability benefits only if s/he is not able to perform any other work.  See id.  Throughout this process, the burden remains upon the claimant until s/he adequately demonstrates an inability to perform

previous work, at which time the burden shifts to the Commissioner to demonstrate the claimant's ability to perform other work.  See Beckley v. Apfel, 152 F.3d 1056, 1059 (8th Cir. 1998).

The Commissioner has supplemented this five-step process for the evaluation of claimants with mental impairments.  See 20 C.F.R. §§ 404.1520a (a), 416.920a (a).  A special procedure must be followed at each level of administrative review.  See id.  Previously, a standard document entitled "Psychiatric Review Technique Form" (PRTF), which documented application of this special procedure, had to be completed at each level and a copy had to be attached to the ALJ's decision, although this is no longer required.  See 20 C.F.R. §§ 404.1520a (d), (d) (2), (e), 416.920a (d), (d) (2), (e); 65 F.R. 50746, 50758 (2000).  Application of the special procedures required is now documented in the decision of the ALJ or Appeals Council. See 20 C.F.R. §§ 404.1520a (e), 416.920a (e).

The evaluation process for mental impairments is set forth in 20 C.F.R. §§ 404.1520a, 416.920a.  The first step requires the Commissioner to "record the pertinent signs, symptoms, findings, functional limitations, and effects of treatment" in the case record to assist in the determination of whether a mental impairment exists.  See 20 C.F.R. §§ 404.1520a (b) (1), 416.920a (b) (1).  If it is determined that a mental impairment exists, the Commissioner must indicate whether medical findings "especially relevant to the ability to work are present or absent." 20 C.F.R. §§ 404.1520a (b) (2), 416.920a (b) (2).  The Commissioner must then rate the degree of functional loss resulting from the impairments in four areas deemed essential to work: activities of daily living, social functioning, concentration, and persistence or pace.  See 20 C.F.R. §§ 404.1520a (b) (3), 416.920a (b) (3).  Functional loss is rated on a scale that ranges

from no limitation to a level of severity which is incompatible with the ability to perform work-related activities.  See id.  Next, the Commissioner must determine the severity of the impairment based on those ratings.  See 20 C.F.R. §§ 404.1520a (c), 416.920a (c).  If the impairment is severe, the Commissioner must determine if it meets or equals a listed mental disorder.  See 20 C.F.R. §§ 404.1520a(c)(2), 416.920a(c)(2).  This is completed by comparing the presence of medical findings and the rating of functional loss against the paragraph A and B criteria of the Listing of the appropriate mental disorders.  See id.  If there is a severe impairment but the impairment does not meet or equal the listings, then the Commissioner must prepare a residual functional capacity assessment.  See 20 C.F.R. §§ 404.1520a (c)(3), 416.920a (c)(3); Jones v. Callahan, 122 F.3d 1148, 1153 n.5 (8th Cir. 1997).

**C.      Plaintiff's Claims on Appeal**

Plaintiff raises two claims on appeal of the Commissioner's decision.  Plaintiff first argues that the ALJ erred in evaluating the credibility of plaintiff's subjective complaints.  Plaintiff next argues that the ALJ erred in assessing plaintiff's residual functional capacity.

**1.      Credibility**

As indicated above, plaintiff first argues that the ALJ erred in evaluating the credibility of plaintiff's subjective complaints.  Defendant contends that the ALJ made a proper credibility determination and found that plaintiff's allegations regarding her limitations were not fully credible.

"While the claimant has the burden of proving that the disability results from a medically determinable physical or mental impairment, direct medical evidence of the cause and effect relationship between the impairment and the degree of claimant's subjective complaints need not

be produced." Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984) (quoting settlement agreement between Department of Justice and class action plaintiffs who alleged that the Secretary of Health and Human Services unlawfully required objective medical evidence to fully corroborate subjective complaints). Although an ALJ may reject a claimant's subjective allegations of pain and limitation, in doing so the ALJ "must make an express credibility determination detailing reasons for discrediting the testimony, must set forth the inconsistencies, and must discuss the Polaski factors." Kelley, 133 F.3d at 588. Polaski requires the consideration of: (1) the claimant's daily activities; (2) the duration, frequency, and intensity of the pain; (3) precipitating and aggravating factors; (4) dosage, effectiveness and side effects of medication; and (5) functional restrictions. Polaski, 739 F.2d at 1322.

Under Polaski, an ALJ must also consider a claimant's prior work record, observations by third parties and treating and examining doctors, and the claimant's appearance and demeanor at the hearing. 739 F.2d at 1322. In evaluating the evidence of nonexertional impairments, the ALJ is not free to ignore the testimony of the claimant "even if it is uncorroborated by objective medical evidence." Basinger v. Heckler, 725 F.2d 1166, 1169 (8th Cir. 1984). The ALJ may, however, disbelieve a claimant's subjective complaints when they are inconsistent with the record as a whole. See Clark v. Chater, 75 F.3d 414, 417 (8th Cir. 1996).

The undersigned finds that the ALJ's credibility determination regarding plaintiff's subjective complaints of pain and limitations is supported by substantial evidence. The ALJ properly pointed out Polaski factors and other inconsistencies in the record as a whole which detract from plaintiff's complaints of disabling pain. The ALJ first discussed plaintiff's work record. The ALJ noted that plaintiff's work record is scattered and somewhat erratic, with fair to

good earnings in some years but little or no earnings in others. Although not controlling on the issue of plaintiff's complaints of disabling pain, a claimant's work history is a proper factor in assessing credibility. See Brown v. Chater, 87 F.3d 963, 965 (8th Cir. 1996). A poor work history prior to the alleged onset of disability lessens the credibility of a plaintiff's allegations of disabling pain. See Woolf v. Shalala, 3 F.3d 1210, 1214 (8th Cir. 1993). The ALJ acknowledged that plaintiff's work record is only one factor to be considered when assessing his credibility. (Tr. 12).

The ALJ next discussed the medical evidence. The ALJ initially noted that although Dr. DeCastro declared plaintiff disabled for the purpose of qualifying him for public assistance in Missouri, this finding is not entitled to great weight in the instant proceeding. (Tr. 12). In fact, Dr. DeCastro expressed the opinion that plaintiff's period of disability would last only three months. (Tr. 129).

The ALJ stated that plaintiff presented to Dr. Villa in May 2001, with a variety of complaints. (Tr. 113-15). Dr. Villa found no spinal tenderness and no evidence of weakness or grip strength problems. (Tr. 114). Dr. Villa prescribed Celebrex for plaintiff's headaches, and Norvasc for plaintiff's Raynaud's phenomenon symptoms, and Viagra for plaintiff's erectile dysfunction. (Tr. 115-16). Plaintiff did not see Dr. Villa again until September 21, 2001, at which time Dr. Villa gave plaintiff samples of Vioxx for leg pain. (Tr. 118). Plaintiff saw Dr. Secor for an examination in connection with his disability claim on June 30, 2003, at which time plaintiff listed 37 complaints. (Tr. 137). Dr. Secor found that plaintiff's gait was unremarkable, plaintiff's straight leg raising was negative, plaintiff had full grip strength, no muscle atrophy, and no joint swelling or tenderness. (Tr. 139). Dr. Secor's impression was probable depression and

most likely degenerative joint disease. (Id.). He recommended that plaintiff exercise and follow-up with his family physician. (Id.). Plaintiff presented to the emergency room on August 22, 2004 and was diagnosed with epididymitis, arthritis, and depression. (Tr. 146-47). Plaintiff presented to Dr. Auner on September 14, 2004, for evaluation of his 37 complaints. (Tr. 150). Dr. Auner found plaintiff to be relatively well muscled without atrophy, and diagnosed plaintiff with depression. (Id.). On September 28, 2004, Dr. Auner stated that plaintiff has "apparent fibromyalgias," and recommended x-rays. (Tr. 151). X-rays of plaintiff's hands and knees were unremarkable. (Tr. 156). On October 12, 2004, Dr. Auner listed plaintiff's diagnoses as fibromyalgia, migraine, and depression, and expressed the opinion that plaintiff was incapacitated and would remain so for at least twelve months. (Tr. 153).

The ALJ stated that he was not accepting Dr. Auner's October 12, 2004 statement as proof of long-term disability, as it was based on plaintiff's subjective complaints and was made in anticipation of plaintiff's disability hearing. (Tr. 14). In analyzing medical evidence, "[i]t is the ALJ's function to resolve conflicts among 'the various treating and examining physicians'" Johnson v. Apfel, 240 F.3d 1145, 1148 (8th Cir. 2001) (quoting Bentley v. Shalala, 52 F.3d 784, 787 (8th Cir. 1995)). "Ordinarily, a treating physician's opinion should be given substantial weight." Rhodes v. Apfel, 40 F. Supp.2d 1108, 1119 (E.D. Mo. 1999) (quoting Metz v. Shalala, 49 F.3d 374, 377 (8th Cir. 1995)). However, such opinions do "not automatically control, since the record must be evaluated as a whole." Id. at 1013 (quoting Bentley, 52 F.3d at 785-786). Opinions of treating physicians may be discounted or disregarded where other "medical assessments 'are supported by better or more thorough medical evidence.'" Id. (quoting Rogers v. Chater, 118 F.3d 600, 602 (8th Cir. 1997)). An ALJ is free to reject the conclusions of any

medical source if those findings are inconsistent with the record as a whole. See Johnson, 240

F.3d at 1148. Such opinions may also be discounted when a treating physician renders

inconsistent opinions. See Prosch, 201 F.3d at 1013.

Here, the ALJ correctly assigned little weight to Dr. Auner's opinion because it is

inconsistent with the record as a whole, including Dr. Auner's own treatment notes. The medical

record reveals that plaintiff was treated conservatively for a variety of minor impairments. Dr.

Auner evaluated plaintiff for his 37 complaints and diagnosed plaintiff only with possible

fibromyalgia and depression. The physical examination Dr. Auner performed was unremarkable.

Further, x-rays taken of plaintiff's hands and knees were negative. (Tr. 156). Thus, the ALJ

properly assigned little weight to Dr. Auner's unsupported statement that plaintiff is disabled.

The ALJ concluded that plaintiff's medical history was sparse and "unimpressive." (Id.).

The ALJ described plaintiff's medical treatment as a "last-minute effort by him to beef up a

theretofore very thin medical record in anticipation of his hearing." (Id.). The ALJ continued,

"[s]uddenly, about two months before the hearing, even though he alleges disability since July

2002, there is a barrage of physical and mental complaints and, for the first time, a semi-serious

persistent course of medical treatment." (Id.). This is an appropriate consideration, because the

fact that a plaintiff fails to seek medical treatment disfavors a finding of disability. See Gwathney

v. Chater, 104 F.3d 1043, 1045 (8th Cir. 1997). The ALJ pointed out that there is no evidence

that plaintiff has ever been refused medical treatment due to an inability to pay. (Id.). Although

the ALJ may not discount subjective complaints solely because they are not fully supported by the

objective medical evidence, the lack of supporting objective medical evidence may be considered

as a factor in evaluating the claimant's credibility. See Curran-Kicksey v. Barnhart, 315 F.3d 964,

968 (8th Cir. 2003).

The ALJ stated that none of plaintiff's physicians, other than Dr. Auner, has placed any limitations on plaintiff. The presence or absence of functional limitations is an appropriate Polaski factor, and "[t]he lack of physical restrictions militates against a finding of total disability." Hutton v. Apfel, 175 F.3d 651, 655 (8th Cir. 1999)(citing Smith v. Shalala, 987 F.2d 1371, 1374 (8th Cir. 1993)). The ALJ pointed out that there is no firm diagnosis of Raynaud's syndrome or fibromyalgia, and all of plaintiff's other physical complaints were either unsubstantiated or minor.

The ALJ next discussed plaintiff's medications. He noted that plaintiff does not take strong doses of any pain medication, and that there is no evidence of any significant side effects from plaintiff's medications. The effects of medication on a claimant is a factor that must be considered under Polaski. See Burress, 141 F.3d at 880.

With regard to plaintiff's mental impairments, the ALJ stated that plaintiff saw psychologist Kenneth Maryfield on May 5, 2003 for a psychological consultation. (Tr. 134-36). Mr. Mayfield noted that plaintiff was receiving no psychiatric treatment. (Tr. 135). Mr. Mayfield found that plaintiff's ability to relate to others was borderline intact and he exhibited indications of considerable social isolation and constrictions of interests and habits. (Id.). Mr. Mayfield assessed a GAF of 60 and recommended counseling. (Id.). He did not provide a diagnosis, although he noted "rule out personality disorder." (Id.). Plaintiff attended therapy eight times in September and October of 2004. (Tr. 158-65). Plaintiff was diagnosed with dysthymia, with a note to rule out hypochondria, and was assessed a GAF of 60. (Tr. 158-59). It was noted that plaintiff was not suicidal. (Tr. 159).

The ALJ found that plaintiff's depression has been mild in degree and sparse in frequency.

He noted that plaintiff's abilities to think, understand, communicate, concentrate, get along with other people, and handle normal work stress have never been significantly impaired on any documented long-term basis. He pointed out that plaintiff did not receive any formal treatment by a mental health professional until September 2004, and even at that time his impairments were not found to be serious. In addition, the ALJ noted that plaintiff did not display any obvious signs of a mental impairment at the hearing. The ALJ thus concluded that plaintiff had no credible, medically-established mental impairment that has significantly affected his mental functioning. (Tr. 15).

The ALJ next discussed plaintiff's daily activities. He stated that although plaintiff's daily activities are restricted, they are restricted by plaintiff's choice rather than by any medical proscription. He pointed out that there is no evidence of nonexertional pain interfering with plaintiff's ability to concentrate.

Finally, the ALJ discussed the testimony of the other witnesses, Mrs. Carpenter and Ms. Van Sant. The ALJ stated that these persons are not medically trained and their statements were undoubtedly influenced to some degree by their affection towards plaintiff. With regard to Mrs. Carpenter, the ALJ noted that she has a financial stake in the outcome of this case. Finally, the ALJ stated that the testimony of these witnesses was inconsistent with the medical record.

An administrative opinion must establish that the ALJ considered the appropriate factors. See Holley v. Massanari, 253 F.3d 1088, 1092 (8th Cir. 2001). However, each and every Polaski factor need not be discussed in depth, so long as the ALJ points to the relevant factors and gives good reasons for discrediting a claimant's complaints. See Dunahoo v. Apfel, 241 F.3d 1033, 1038 (8th Cir. 2001). In this case, the reasons given above by the ALJ for discrediting plaintiff's

complaints of disabling pain are sufficient and his finding that plaintiff's complaints are not credible is supported by substantial evidence.

Accordingly, the undersigned recommends that the decision of the Commissioner be affirmed as to this point.

### 2.    Residual Functional Capacity

Plaintiff argues that the ALJ erred in assessing plaintiff's residual functional capacity. Specifically, plaintiff contends that the ALJ erred in failing to acknowledge plaintiff's non-exertional limitations.  Defendant argues that the ALJ properly determined plaintiff's residual functional capacity.

Determination of residual functional capacity is a medical question and at least "some medical evidence 'must support the determination of the claimant's [residual functional capacity] and the ALJ should obtain medical evidence that addresses the claimant's ability to function in the workplace.'" Hutsell v. Massanari, 259 F.3d 707, 712 (8th Cir. 2001) (quoting Lauer v. Apfel, 245 F.3d 700, 704 (8th Cir. 2001)).  Further, determination of residual functional capacity is "based on all the evidence in the record, including 'the medical records, observations of treating physicians and others, and an individual's own description of his limitations.'" Krogemeier v. Barnhart, 294 F.3d 1019, 1024 (8th Cir. 2002) (quoting McKinney v. Apfel, 228 F.3d 860, 863 (8th Cir. 2000)).  Similarly, in making a finding of residual functional capacity, an ALJ may consider non-medical evidence, although the residual functional capacity finding must be supported by *some* medical evidence. See Lauer**,** 245 F.3d at 703.

After discussing the objective medical evidence and plaintiff's own statements regarding his impairments, the ALJ concluded:

> [t]he undersigned finds no persuasive medical reason why the claimant could not perform all jobs, except possibly those requiring frequent lifting or carrying of more than about 50 pounds. The claimant's past relevant job as a store manager, as he described and performed it (Exhibit 1E, p. 3), did not require the performance of work activities precluded by these limitations. This job, specifically, was done between 1991 and 1995. It was performed for substantial earnings within the last 15 years (Exhibits 2D, 3E), and is therefore still vocationally relevant. 20 CFR 404.1565 and 416.965.

(Tr. 13-14).

The ALJ's residual functional capacity assessment is supported by the record as a whole. As previously discussed, the medical record reveals that plaintiff received sporadic treatment for many minor and unsubstantiated impairments. The ALJ discussed plaintiff's allegations of severe non-exertional impairments and found them to be not credible. The ALJ then compared plaintiff's residual functional capacity with the demands of plaintiff's past relevant work and determined that plaintiff was able to perform his past work as a store manager. The ALJ thus properly found that plaintiff was not disabled.

Accordingly, the undersigned recommends that the decision of the Commissioner be affirmed as to this point.

## RECOMMENDATION

**IT IS HEREBY RECOMMENDED** that the decision of the Commissioner denying plaintiff's applications for Disability Insurance Benefits under Title II of the Social Security Act and Supplemental Security Income benefits under Title XVI of the Act be affirmed.

The parties are advised that they have eleven (11) days, until August 25, 2006, to file written objections to this Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1), unless an extension of time for good cause is obtained, and that failure to file timely objections may result in a waiver of the right to appeal questions of fact. See Thompson v. Nix, 897 F.2d 356, 357 (8th Cir. 1990).

Dated this  14th  day of August, 2006.

_Lewis M. Blanton_
LEWIS M. BLANTON
UNITED STATES MAGISTRATE JUDGE